FILED

2007 Sep-06  PM 04:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN  DIVISION**

| | | |
|---|---|---|
| **ARAMETTA PORTER**, | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **CV-06-BE-1423-E** |
| | ] | |
| **UNITED STATES OF AMERICA,** | ] | |
| | ] | |
| **Defendant.** | ] | |
| | ] | |

**<u>MEMORANDUM OPINION</u>**

This case is before the court on Defendant United States of America's ("Government")

Motion to Dismiss Plaintiff's FTCA Claims for Lack of Subject Matter Jurisdiction (doc. 4).

Although the court concludes that the Federal Tort Claims Act's ("FTCA") discretionary

function exception does not bar Plaintiff's cause of action based on alleged violations of

regulations under the Resource Conservation and Recovery Act of 1976 ("RCRA"), the court

nonetheless lacks subject matter jurisdiction over count II under the RCRA's citizen suit

provision.  Count I's claim of common law negligence, as pleaded, does fall within the

discretionary function exception and, thus, the Government has not waived sovereign immunity

for that claim; the court, therefore, lacks subject matter jurisdiction over that claim as well.

Accordingly, the court GRANTS Defendant's motion and DISMISSES the complaint without

prejudice.

## I.  BACKGROUND

Plaintiff Arametta Porter claims she was injured by sarin gases that escaped from the

Anniston Army Depot ("ANAD"), a hazardous waste storage facility operated pursuant to a

permit obtained under the RCRA.

The RCRA, 42 U.S.C. §§ 6901-6992k, establishes a comprehensive scheme for regulating the disposal of solid and hazardous wastes.  The RCRA contemplates a federal-state partnership to implement its provisions; the Environmental Protection Agency ("EPA") may authorize an individual state's hazardous waste management program.  A state's EPA-approved program under RCRA operates "in lieu of the federal program," and the state may issue and enforce permits, which have the same effect as EPA-issued RCRA permits.  42 U.S.C. § 6926(b).

In 1978, the Alabama legislature enacted the Alabama Hazardous Waste Management and Minimization Act, Ala. Code §§ 22-30-1 through -24.  The state subsequently promulgated a regulatory program, which the EPA authorized in 1987 pursuant to the RCRA.  The Alabama Department of Environmental Management ("ADEM") administers the state program.  Alabama's RCRA regulatory requirements establish specific performance standards, operating requirements, waste identification and analysis standards, and monitoring and inspection requirements.  *See* Ala. Admin. Code r.335-14-5-.15(4).

ADEM has established a lengthy and detailed process that an owner or operator of a hazardous waste treatment, storage, or disposal facility must follow to obtain an RCRA permit.  ADEM evaluates applications to ensure compliance with its regulations, subjects the  permit application to public hearing, and issues a final decision approving or denying the permit.  The Government includes as Exhibit 3 to its memorandum of law the Army's May 1990 RCRA Part B Permit Application for Hazardous Waste Storage Facilities at ANAD.  The Army stored chemical surety materials – chemical agents and associated weapon systems, storage containers, and shipping containers, including GB nerve agent (*i.e.*, sarin gas) – at ANAD.

On August 1, 1995, an enhanced storage monitoring inspection ("SMI") was scheduled for selected lots of M55 GB Rockets at ANAD.  During an SMI, the atmosphere within the

munition storage structure (called an "igloo") is tested and each container or munition is visually inspected.  Any items showing evidence of leakage are tested and, if leaking, handled in accordance with detailed protocols.  During the August 1, 1995 SMI, workers removed sampling plugs from certain containers; an alarm sounded *within* the inspected igloo, and the workers confirmed the presence of GB, replaced the sampling plugs, and exited the igloo.  After an alarm *outside* the igloo also sounded, a monitoring team confirmed the presence of GB outside the igloo.  The Government states that the Army then followed protocols for containing and reducing GB vapor levels, as well as plotting and predicting the area of concern assuming the maximum possible release of GB from the igloo.  On August 2, 1995, workers planned to reenter the igloo to containerize the leaker munitions.  An alarm again sounded and the workers abandoned the project until the following day.  On August 3, 1995, workers containerized the leaker munitions and transported them to an isolation/leaker igloo.

Plaintiff Arametta Porter resides approximately four miles from the ANAD outer boundary and more than five miles from the igloo from which GB leaked on August 1-3, 1995.  She alleges that, on August 3, 1995, a gust of wind struck her outside her home.  Approximately fifteen minutes later, "her ears popped; she could not protrude her tongue, her heart began to race, her breathing was accelerated; she developed a strange sensation in her facial muscles, and her feet began to tingle . . . she felt like she was having a stroke."  (Def.'s Ex. 26.)  As a result of these symptoms, Porter visited the hospital, where she was diagnosed with Bell's palsy, "unilateral facial paralysis of sudden onset, due to lesion of the facial nerve and resulting in characteristic distortion of the face."  (Def.'s Mem. of Law 17) (citing Dorland's Illustrated Medical Dictionary 956 (26th ed. 1985)).  Porter alleges that her symptoms have progressively worsened since onset.

Porter submitted a claim to the Department of the Army on March 21, 2003, seeking $500,000,000.  On January 25, 2006, the Army denied her claim, and Porter's complaint against the Government in this court followed.  Porter alleges common law negligence in count I and negligence for violation of ADEM's regulations under the RCRA in count II.  She seeks damages in the amount of $15,000,000, attorneys' fees, and any other relief that is proper.

The Government moved to dismiss Porter's claims for lack of subject matter jurisdiction. According to the Government, the discretionary function exception to the FTCA's waiver of sovereign immunity precludes this action.  The Government argues that the ADEM regulations do not prescribe mandatory and specific standards and, therefore, leave the mechanism of compliance to the Army's discretion.  Exercise of this discretion, the Government continues, involves policy judgments.  Consequently, the Government concludes, Congress did not intend for the FTCA's waiver of sovereign immunity to apply in this situation.

## II.  STANDARD OF REVIEW

Typically, a court may not consider materials outside the pleadings in deciding a motion to dismiss.  *See Trustmark Ins. Co. v. ESLU, Inc.*, 299 F.3d 1265, 1267 (11th Cir. 2002). "[W]hen a defendant properly challenges subject matter jurisdiction under Rule 12(b)(1)," however, "the district court is free to independently weigh facts, and may proceed as it never could under Rule 12(b)(6)."  *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003). Because the issue presented by a motion to dismiss under Rule 12(b)(1) is "the trial court's jurisdiction – its very power to hear the case – there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the exercise of its power to hear the case."  *Id.*

### III.  DISCUSSION

**A.**      **Discretionary Function Exception**

**1.**      **Legal Framework**

Congress, through the FTCA, has waived the United States' sovereign immunity for actions based upon the "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment."  28 U.S.C. § 1346(b)(1).  Actions based on no-fault or strict liability theories are nonetheless barred.  *See Laird v. Nelms*, 406 U.S. 797, 802-03 (1971).  The FTCA's waiver is subject to a number of exceptions, including the discretionary function exception, which retains sovereign immunity for "any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).

The court must apply a two-part test to determine whether conduct falls within the discretionary function exception.  *See United States v. Gaubert*, 499 U.S. 315, 325 (1991); *Hughes v. United States*, 110 F.3d 765, 767 (11th Cir. 1997).  First, the court must determine "whether the challenged conduct involves an element of judgment or choice."  *Hughes*, 110 F.3d at 767 (citing *Powers v. United States*, 996 F.2d 1121, 1124 (11th Cir. 1993)).  The second question is "whether that judgment is of the kind that the discretionary function exception was designed to shield."  *Id.* (quoting *Gaubert*, 499 U.S. at 322-23).

Under the first step of the test, the "relevant inquiry is whether the controlling statute or regulation mandates that a government agent perform his or her function in a specific manner."  *Hughes*, 110 F.3d at 768 (quoting *Powers*, 996 F.2d at 1125).  Conduct does not involve an element of judgment or choice if a "'federal statute, regulation, or policy specifically prescribes a

course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" *Ochran v. United States*, 117 F.3d 495, 499 (11th Cir. 1997) (quoting *Gaubert*, 499 U.S. at 322); see also *Autery v. United States*, 992 F.2d 1523, 1529 (11th Cir. 1993) (holding that "only when the statute or regulation specifically prescribes a course of action . . . embodying a fixed or readily ascertainable standard, will a government employee's conduct not fall within the discretionary function exception" (citations omitted)).

In *Ochran*, the plaintiff was threatened by her ex-boyfriend after she informed an anti-drug task force of his drug-trafficking activities. 117 F.3d at 498. The plaintiff informed the Assistant U.S. Attorney ("AUSA") of the threat, but received no protection. *Id.* The plaintiff's ex-boyfriend later attacked and stabbed her. *Id.* at 499. The plaintiff then brought an FTCA action, alleging that the U.S. Attorney's office negligently failed to protect her. *Id.* The plaintiff alleged that the AUSA violated the Attorney General Guidelines for Victim and Witness Assistance ("Guidelines"), which required the AUSA to "make the necessary and appropriate arrangements to enable victims and witnesses to receive reasonable protection against threat, harm and intimidation" and to inform the U.S. Marshals Service "of instances involving intimidation or harassment of any victim or witness." *Id.* (quoting Guidelines, art. III, § D(2) (1991)).

The Eleventh Circuit disagreed with the plaintiff in *Ochran* that the Guidelines' use of the mandatory verb "shall" in imposing these duties made them specific, non-discretionary requirements. On the contrary, the Eleventh Circuit noted that the Guidelines left much to the AUSA's discretion: *whether* protection is warranted; *how* the protection is provided; and *when* information is made available. *Ochran*, 117 F.3d at 500-01. The Court held, therefore, that the first part of the discretionary function test was satisfied because "the Guidelines cited by Ochran

leave room for responsible officials to exercise choice or judgment in discharging their responsibilities." *Id.* at 501.

The focus of the second part of the test is whether the government employees' actions are "susceptible to policy analysis," *Hughes*, 110 F.3d at 768 (quoting *Powers*, 996 F.2d at 1125), but the employees' subjective intent or actual consideration of policy is irrelevant. *Ochran*, 117 F.3d at 500.  In *Hughes*, after concluding that the general guidelines at issue satisfied part one of the test, the Eleventh Circuit held that decisions concerning security measures at post offices fall within the economic and social policies required to achieve the congressionally-mandated goals. 110 F.3d at 768.  Congress charged the Postal Service with providing "prompt, reliable, and efficient services . . . to all communities." *Id.* (quoting 39 U.S.C. § 101(a)). Because "[p]ostal employees must decide how to allocate resources so as to best serve customers in a prompt, reliable, and efficient manner," the Court held that the choice of security measures at post offices was the sort of policy choice protected by the discretionary function exception.  *Hughes*, 110 F.3d at 769.

### 2.      Violations of ADEM Regulations

The parties' arguments concerning the discretionary function exception present an interesting question on which this circuit has little case law: where compliance with applicable regulations clearly "involves an element of judgment or choice," do detailed chemical inspection and preventative procedures, submitted as part of a hazardous waste storage facility permit application, remove a challenged action from the ambit of the discretionary function exception? Because ADEM issues the permit based upon representations in the application, and because the plans and procedures submitted with the application are expressly incorporated into the permit itself, the court concludes that the Army's employees perform their duties *without discretion*.

On their face, the ADEM regulations at issue in this case seem very similar to those at issue in *Ochran*. The ADEM regulations provide that "[f]acilities must be . . . operated to minimize the possibility of . . . any unplanned sudden or non-sudden release of hazardous waste," Ala. Admin. Code r.335-14-5-.03(2); that the "operator must inspect his facility for . . . operator errors, and discharges which may . . . [cause] the release of hazardous waste" and "must conduct these inspections often enough to identify problems in time to correct them before they harm human health or the environment," Ala. Admin. Code r.335-14-5-.02(6)(a); that the "operator must remedy any deterioration or malfunction" to prevent these problems, Ala. Admin. Code r.335-14-5-.02(6)(c); and that the "operator . . . must take precautions to prevent . . . toxic mists, fumes, or gases," Ala. Admin. Code r.335-14-5-.02(8)(b)(2). Like the Guidelines in *Ochran*, these regulations do not prescribe the appropriate *means* of minimizing release of hazardous waste, the *frequency* of the required inspections, the remedial *mechanism* in the case of malfunction or release, or the *types* of precautions to prevent release.

ADEM regulations do provide, however, that compliance with these regulations is measured by the owner's or the operator's permit application. *See* Ala. Admin. Code r.335-14-8-.02(5)(a) (stating that "the Part B information requirements [for permit applications] . . . reflect the standards promulgated in 335-14-5 . . . [and] are necessary in order for the Department [*i.e.*, ADEM] to determine compliance with the 335-14-5 standards"); *see also Families Concerned About Nerve Gas Incineration v. U.S. Dep't of the Army*, 380 F. Supp. 2d 1233, 1245 (N.D. Ala. 2005) (noting that "compliance with a state hazardous waste permit constitutes compliance with the requirements of RCRA").

As part of the permit application requirements, the Army was in fact required to submit for approval general and specific inspection schedules for ANAD. *Id.* r.335-14-8-.02(5)(b)(5).

In addition, the regulations require the permit application to include descriptions of the following:  the procedures to prevent releases into the atmosphere, *Id.* r.335-14-8-.02(5)(b)(8)(vi); and the precautions related to r.335-14-5-.02(8), *Id.* r.335-14-8-.02(5)(b)(9). These regulatory provisions are implemented by sections of the permit, which provide that the operator must comply with specific procedures and schedules incorporated into the permit.  *See Families*, 380 F. Supp. 2d at 1246.

Section F of the Army's permit application "presents the details of inspection and corrective action."  (Def.'s Ex. 3-B, at D13.)  These details include detailed schedules for inspecting specific items (*Id.* at F-5); a set of detailed and specific inspection logsheets and checklists (*Id.* at F-10 to 17A); and procedures in the event of failures and precautions to be taken (*Id.* at F-18 to F-38).  According to deposition testimony, these schedules and checklists are mandatory for the employees at ANAD.  (Pl.'s Ex. 1, at 22, 247-48.)

The procedures, plans, and schedules developed by the Army, which were subsequently approved by ADEM and incorporated into the Army's permit to operate ANAD, are specific, mandatory directives that preclude application of the discretionary function exception.  *See Limar Shipping Ltd. v. United States*, 324 F.3d 1, 8 n.6 (1st Cir. 2003) ("The fact that we are concerned here with internal procedures and guidelines, as embodied in the *Army Corps Manual*, rather than with federal statutes or regulations does not change our analysis.").  The Army's procedures, plans, and schedules ensure compliance with the general regulations and are incorporated into the permit, the violation of which is actionable.  In other words, the procedures are mandatory and have the force of law; thus, they fall outside the discretionary function exception.  *Cf. Good v. Ohio Edison Co.*, 1996 WL 652599, at *5 (N.D. Ohio 1996) (holding that the discretionary function exception applied where internal procedures were nothing "more than

a field-level instructional guide" without the force of law); *Cooley v. United States*, 791 F. Supp. 1294, 1306 (E.D. Tenn. 1992) (holding that the discretionary function exception applied where internal procedures were not binding on the agency).

The Army's initial discretion in deciding the precise procedures by which to comply with the regulation insulates it only to the extent that its employees comply with the procedures, *Gaubert*, 499 U.S. at 323-24; this discretion does not insulate the Army from actions based on *violations* of those procedures. *Gaubert*, 499 U.S. at 324 ("If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy."). Although Porter alleges violations of the regulations themselves, as discussed above, compliance with the regulations is measure by compliance with one's permit. Therefore, the court concludes that the first step of the test is not satisfied, and the discretionary function exception does not apply to count II of Porter's complaint, based on violations of ADEM regulations. Accordingly, the court denies the Government's motion to dismiss on this ground.

### 3.    Common Law Negligence

The FTCA allows actions for common law negligence like that pleaded in count I of Porter's complaint. The duty of care under Alabama law is "the standard of reasonable conduct . . . commensurate with the apparent risk or danger." *Indus. Chem. & Fiberglass Corp. v. Chandler*, 547 So. 2d 585, 831 (Ala. 1988). The course of conduct that the hypothetical "reasonable man" would take under the circumstances is not clearly defined, but varies from case to case. *See Stanford v. Wal-Mart Stores, Inc.*, 600 So. 2d 234, 237 (Ala. 1992), *quoting* William L. Prosser, *Law of Torts* § 31, at 149 (4th ed. 1974) (stating that "it is seldom possible to reduce negligence to any definite rules; it is 'relative to the need and the occasion'").

Porter has not identified any statutes, regulations, or policies, aside from those under the RCRA, that establish the Army's duty of care to her.[1]  Although a general allegation of negligence is usually sufficient, where the defendant has brought a factual challenge to subject matter jurisdiction, the plaintiff must "prove that there are regulations or policies that specifically prescribe a course of action."  *OSI, Inc. v. United States*, 285 F.3d 947, 952 n.2 (11th Cir. 2002).  "Harsh as it may be, whether the Army substantially endangered Plaintiff['s] health and welfare is irrelevant to the discretionary function determination."  *Daigle v. United States*, 972 F.2d 1527, 1540 (10th Cir. 1992).  The relevant question is whether specific, mandatory directives exist; one can hardly argue that the amorphous "reasonable man" standard does not involve "an element of judgment or choice" under the first step of the discretionary function exception.  Porter's common law negligence claim, therefore, satisfies the first part of the test.

Turning to step two, the court easily concludes that the storage and treatment of hazardous wastes involves the balancing of economic, safety, and security considerations. *See Lockett v. United States*, 938 F.2d 630, 639 (6th Cir. 1991) (holding that determinations about priorities of threats to public health are protected policy judgments and citing to decisions from the D.C., Seventh, and Eighth Circuits).  Therefore, Porter's common law negligence claim, as currently pleaded, falls within the discretionary function exception, sovereign immunity applies, and the court lacks subject matter jurisdiction over count I.  *See Gaubert*, 499 U.S. at 324-25 (stating that a complaint will survive a motion to dismiss only if it alleges facts to support a finding that the challenged actions are not of the type grounded in policy considerations).

---

[1] In her response, Porter alleges for the first time that Army Regulation AR 190-59 establishes the Army's duty to safely store chemical agents.  (Pl.'s Resp. 17 n.2.)  However, Porter does not identify the specific, mandatory provisions within AR 190-59 that would establish subject matter jurisdiction.

**B.     The RCRA's Citizen Suit Provision**

The Government focuses only on the discretionary function exception, which, as discussed above, does not apply to Porter's RCRA claim.  Rather than trying to fit this case within *an exception* to the FTCA, the Government instead should have focused on whether Congress has waived sovereign immunity for this type of case at all.  The answer to that question, based on the clear text of the RCRA, the legislative history, and Supreme Court precedent, is no.

The FTCA waives sovereign immunity "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, *if a private person, would be liable* to the claimant in accordance with the law of the place where the act or omission occurred."  42 U.S.C. § 1346(b)(1) (emphasis added).  Under the RCRA's citizen suit provision, however, a private person would not be liable to Porter for the redress she seeks.

The RCRA citizen suit provision provides, in relevant part, that a person may bring an action "against any person (including . . . the United States . . .) who is alleged to be in violation of any permit, standard, regulation, [etc.]," 42 U.S.C. § 6972(a)(1)(A), or "who has contributed or who is contributing to the past or present handling, storage, treatment, transportation or disposal of . . . hazardous waste which may present an imminent and substantial endangerment to health or the environment."  42 U.S.C. § 6972(a)(1)(B).  District courts have jurisdiction "to enforce the permit, standard, regulation, [etc.] . . . referred to in paragraph (1)(A), [and] to restrain any person who has contributed or is contributing to the past or present handling, storage,

treatment, transportation, or disposal of . . . hazardous waste referred to in paragraph (1)(B)." 42 U.S.C. § 6972(a).

Although the district courts have jurisdiction over actions for injunctive relief, the RCRA's citizen suit provision does not give district courts jurisdiction to award *damages*. *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 484 (1996); *see also Abreu v. United States*, 468 F.3d 20, 31 (1st Cir. 2006) (holding that compensatory damages under the FTCA are not allowed when based on violations of the RCRA); *Hassin v. EPA*, 41 F. App'x 888 (7th Cir. 2002) (upholding district court's dismissal for failure to state a claim where plaintiff sought compensatory damages under RCRA); *Furrer v. Brown*, 62 F.3d 1092, 1096 (8th Cir. 1995) (holding that the RCRA does not authorize district courts to award monetary relief); *Walls v. Waste Res. Corp.*, 761 F.2d 311, 315-16 (6th Cir. 1985) (holding that the RCRA citizen suit provision does not permit private actions for damages).  In amending the RCRA in 1992, Congress confirmed this limitation – particularly regarding actions against the United States.  In those amendments, Congress expressly waived sovereign immunity for "all civil and administrative penalties and fines," Pub. L. 102-386, 106 Stat. 1505, 1506 (Oct. 6, 1992), *codified at* 42 U.S.C. § 6961(a), but made clear that it did "not intend that the amendment reaffirming the waiver of sovereign immunity . . . to authorize civil tort actions against the federal government for damages."  H.R. Rep. No. 102-111, at 15 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1287, 1301.  Therefore, the court lacks subject matter jurisdiction over Porter's negligence claim for damages based on violations of the RCRA.

## IV.  CONCLUSION

For the reasons stated above, the discretionary function exception applies to Porter's common law negligence claim, but the discretionary function exception does not preclude

-13-

Porter's RCRA negligence claim because the Army's permit application establishes mandatory procedures that include specific, ascertainable standards of compliance.  Nonetheless, the RCRA does not permit a cause of action for damages against any person, including the United States. Therefore, the court lacks subject matter jurisdiction over both counts.  Accordingly, the court GRANTS Defendant's motion and DISMISSES the complaint without prejudice.  The court will enter a separate order consistent with this memorandum opinion.

    DATED this 6th day of September, 2007.


KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE